608 S.E.2d 418

The STATE, Respondent,

v.

Jonathan Kyle BINNEY, Appellant.

No. 25920.

Supreme Court of South Carolina.

Heard Sept. 21, 2004.
Decided Jan. 10, 2005.
Rehearing Denied Feb. 17, 2005.

354

Acting Chief Attorney Joseph L. Savitz, III, of the South Carolina Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Harold W. Gowdy, III, of Spartanburg, for Respondent.

Chief Justice TOAL:

In November 2002, Appellant Jonathan Kyle Binney (Binney) was convicted of murder and first-degree burglary and sentenced to death by a Cherokee County jury. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

In early June 2000, Cherokee County police received a call that a local resident, upon returning home from work, was surprised and shot by a man who was hiding inside her house. When police went to the victim's residence to investigate, they found a suicide note Binney wrote and signed. Binney was later found in the crawl space of his Spartanburg County residence.

Before Binney was arrested and was read his *Miranda* rights, Binney turned to Cherokee County Sheriff's Deputy Steve Reynolds and said, "she's dead isn't she?" Reynolds replied, "who?" And Binney responded, "the woman I shot."

During Binney's detainment and eventual arrest, Binney's wife was talking on a cordless phone to Bill Bannister (Bannister), Binney's attorney in another matter.[1] Captain Mike Fowlkes (Fowlkes) with the Cherokee County Sheriff's Department testified that while Binney's wife was on the phone, she repeatedly told Binney not to say anything to the officers. Eventually, while still at the residence, SLED agent DeWitt "Spike" McCraw (McCraw) spoke with Bannister and assumed that Bannister would continue to represent Binney in the present matter.[2]

---

1. Bannister was representing Binney in a pending case where Binney was charged with criminal sexual conduct with a minor (CSC).

2. Later, Bannister declined to represent Binney, and Don Thompson, public defender for Cherokee County, was appointed; however, Thomp-

After hearing of Binney's arrest, Don Thompson (Thompson), Public Defender for Cherokee County, went to the jail to talk to Binney. Binney told Thompson that he wanted the death penalty, and Thompson told Binney not to talk to the police. Thompson met with Binney again a few days later, and Binney was still determined to get the death penalty.[3]

At trial, Thompson testified that almost everyday during the first week of Binney's incarceration, either agent McCraw or the solicitor's office asked for permission to interrogate Binney. Thompson testified that he repeatedly refused their requests and told them that they could not talk to Binney.

On Friday, June 14, 2000, approximately a week after Binney's arrest, Thompson visited Binney and later testified that "it was hard to talk to him about anything," and that Binney mostly wanted to talk about the death penalty. On that same day, McCraw called Thompson and asked if he could send Binney a message asking Binney to submit to an interrogation without the presence of an attorney. Thompson told McCraw that he could not.

Also on June 14, McCraw contacted Travis Alexander (Alexander), a jailer who worked at the prison where Binney was incarcerated. McCraw told Alexander to find Binney and let him know that if he wanted to talk then he had to make a written request to talk with a detective without the presence of an attorney.[4] Within hours of contacting Alexander, McCraw received a handwritten note from Binney, which included a request to see a detective, without the presence of an attorney.

On that same day, McCraw and Fowlkes picked Binney up and brought him to the Sheriff's Office. Before questioning began, Binney was advised of his rights, and he signed a pre-

---

son did not represent Binney at trial. Later, Trent N. Pruett and Sam "Mitch" Slade, Jr., were appointed to represent Binney at trial.

3. Binney was put on suicide watch for the first several days that he was incarcerated.

4. McCraw denies that he told Alexander to tell Binney that he would have to specify in writing that he did not want an attorney present; however, Binney testified that he included this specification in his request at Alexander's instruction.

interrogation waiver form. In addition, at trial, he testified that he did not have any trouble understanding what the officers told him about his right to an attorney. McCraw and Fowlkes testified that during the interrogation, Binney appeared coherent, indicated that he understood the nature of the interrogation, and was never promised anything or coerced in anyway. Eventually, Binney wrote and signed a five-page statement confessing to the murder.[5] At no time during Binney's arrest, incarceration, or questioning did Binney ask to have his attorney present.

During his confession, Binney told police what took place during the commission of the murder. He explained that before he was tried for the CSC charge, Bannister, Binney's lawyer at the time, told him that, if convicted, he would be sentenced to ten years, at the very least. The potential for substantial, future jail time made Binney very anxious. He went to a local shopping center and found a friend who sold him a handgun. He then went to the victim's house and hid just off the property line and watched the house and looked for activity. Binney never met the victim before the day of the murder. He stayed in the surrounding woods overnight thinking about whether he should just go into the house "to commit suicide or rape someone, or to just shoot all of them and kill [himself]."

The next morning, he waited until the victim and her husband left the house and then entered the house through an unlocked window. He cut all the phone lines in the house and put kitchen knives and other possible weapons out of reach. Late that afternoon, the victim came home and found Binney in her bathroom. The victim startled Binney because he did not hear her enter the house. Binney fired the gun in her direction and then chased her out of the house. Once outside, he shot in her direction again to "keep her scared and running" and then ran in the opposite direction into the woods. He ran home and hid under his house, where he was later found by police.

In his June 14 statement, Binney requested that he be given the death penalty: "the crime I committed definitely warrants it." In addition, he stated that he was not promised anything

---

5. This is the June 14 statement that Binney argues was improperly admitted.

or coerced in any way. In addition, Binney wrote "I waive my right to an attorney." After Binney wrote and signed his June 14 statement, he took McCraw and Fowlkes to the woods next to the victim's house where he hid his moped and the murder weapon.

On Monday, June 17, three days after Binney sent his first written request, Binney sent McCraw another request to meet. Again, McCraw read Binney his rights and had him sign another waiver. Mike Prodan (Prodan), head of the Behavioral Science Unit at SLED, also attended the June 17 interrogation, because McCraw requested the assistance of someone with experience in investigating crimes involving sexual motives.

Meanwhile, on that same day, Thompson received a message that Binney met with police and signed a statement the previous Friday, June 14. Thompson eventually found Binney at the Sheriff's Office. McCraw and Prodan testified that Thompson "burst in" to the interrogation room and told Binney to quit talking. When Binney turned to McCraw and asked him what to do, McCraw responded, "*he* works for *you.*" (Emphasis added.) Binney told Thompson to leave so that he could continue talking to the officers.

At the suppression hearing, McCraw testified that Thompson never told him not to talk to Binney. The judge found that Binney never invoked his Fifth Amendment right to an attorney. Moreover, the judge found that Binney knowingly and intelligently waived his Fifth Amendment right to an attorney and that McCraw's communication to Binney inviting him to request a meeting was not an "interrogation."

Binney raises the following issue on appeal:

Did the trial judge err in admitting into evidence Binney's June 14 statement because it was taken in violation of Binney's Fifth Amendment right to have an attorney present during a custodial interrogation?

## LAW/ANALYSIS

Binney argues that the trial judge erred in admitting the June 14 statement in which he confessed to murder because the statement was procured in violation of his Fifth Amendment right to have an attorney present during a custodial interrogation. We disagree.

■■■ The State has the burden to show by the preponderance of the evidence that a defendant has voluntarily waived his right to counsel. *State v. Franklin,* 299 S.C. 133, 137, 382 S.E.2d 911, 913 (1989). Police must inform criminal suspects of their right to have an attorney present during a custodial interrogation before the interrogation commences. *Miranda v. Arizona,* 384 U.S. 436, 473–474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court went on to say that "[o]nce warnings have been given, the subsequent procedure is clear . . . [i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* In addition, police are restricted from initiating contact with a suspect when that contact is the "functional equivalent" of an interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The "functional equivalent" of an interrogation is

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from a suspect.

*Id.*

In *Edwards v. Arizona,* the United States Supreme Court elaborated on one's right to have an attorney present during a custodial police interrogation. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In that case, the police reinitiated an interrogation and eventually elicited a confession sometime after the defendant requested an attorney and interrogation had ceased. The Supreme Court of Arizona upheld the conviction, holding that the defendant's confession was voluntarily given. The United States Supreme Court reversed, holding "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Id.* at 483, 101 S.Ct. 1880.

■■■ To invoke a Fifth Amendment right to counsel, one must give "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *see also State v. Kennedy,* 333 S.C. 426,

430, 510 S.E.2d 714, 715 (1998) (holding that an unequivocal invocation of the Fifth Amendment right to counsel must be presented in a manner that a reasonable police officer, under similar circumstances, would understand the statement to be a request for the presence of an attorney).

Nevertheless, this Court has held that

[a] valid waiver of the right to counsel will not be presumed simply from the silence of the accused after *Miranda* warnings are given. The record must show an accused was offered counsel but intelligently and knowingly rejected the offer.

*State v. McCray,* 332 S.C. 536, 546, 506 S.E.2d 301, 306 (1998).

■ In addition, a criminal suspect's rights are not violated when the suspect, not the police, "initiates further communication, exchanges, or conversations with the police." *State v. Howard,* 296 S.C. 481, 489, 374 S.E.2d 284, 288 (1988) (citing *Edwards,* 451 U.S. at 485, 101 S.Ct. 1880). Finally, this Court has held that, after it has been determined that the waiver was valid, the analysis is over:

[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*State v. Drayton,* 293 S.C. 417, 426, 361 S.E.2d 329, 334–335 (1987) (citing *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

■ In the present case, we find that the following facts support the conclusion that Binney's Fifth Amendment rights were not violated and that his June 14 statement was admissible:

(1) There is no evidence that Binney ever asked for an attorney at any point during his arrest, incarceration, or questioning.

(2) Binney has an adequate level of intelligence, and he has been arrested and read his rights before.

(3) In his written request, Binney stated that he did not want an attorney present during the meeting with detectives.

(4) Before Binney provided police with a statement, he was again read his rights and he signed a waiver of rights.

■ In addition, McCraw's message to Binney instructing him to write a written request to meet was not the initiation of an "interrogation," because it would not reasonably elicit an incriminating response. Instead, McCraw's message was simply an invitation for Binney to initiate contact. Moreover, Binney's request to meet with a detective and his later confession both were made out of his own free will, without coercion or deception. In fact, the record indicates that Binney was motivated to talk with police to get off of suicide watch. Finally, nothing in the record suggests that Binney was not fully informed of his rights, did not understand his rights, or that the confession was not the product of his own free will.

## SENTENCE REVIEW

■ The Court must conduct a proportionality review of Binney's death sentence based on the record. S.C.Code Ann. § 16–3–25(A) (2003). In conducting the review, the Court considers similar cases in which the death penalty has been upheld. *See* S.C.Code Ann. § 16–3–25(E) (2003).

We find Binney's death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the evidence supports the trial judge's findings of aggravation. *See* S.C.Code Ann. § 16–3–25(C) (2003). In addition, Binney's sentence, in relation to the sentences this Court has upheld in similar cases, was not excessive or disproportionate to his crime. *See State v. Tench,* 353 S.C. 531, 579 S.E.2d 314 (2003); *State v. Weik,* 356 S.C. 76, 587 S.E.2d 683 (2002), *cert denied,* 539 U.S. 930, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003); *State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721 (2000).

## CONCLUSION

For the foregoing reasons, we affirm Binney's conviction and sentence and hold that the trial judge did not err in admitting the June 14 statement into evidence.

**AFFIRMED.**

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.