577 S.E.2d 438

**The STATE, Respondent,**

v.

**Charles O. SHULER, Appellant.**

No. 25591.

Supreme Court of South Carolina.

Heard Dec. 3, 2002.

Decided Feb. 3, 2003.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney

General Donald J. Zelenka, Assistant Attorney General Derrick K. McFarland, all of Columbia; and Solicitor Walter M. Bailey, Jr., of Summerville, for respondent.

Justice BURNETT.

Appellant was convicted of three counts of murder and first degree burglary. He was sentenced to death for the murders and life imprisonment for burglary. We affirm.

### GUILT PHASE [1]

During his opening statement, defense counsel admitted appellant killed Linda Williams, her thirteen year old daughter Stacy, and Linda's mother, Dorothy Gates. He stated appellant had tried to cope with a complicated relationship but "snapped."

Evidence indicated appellant lived with Linda for two years. On September 3, 1999, Linda asked appellant to move out of her home. The following day, the police were summoned to Linda's home and a deputy told appellant to leave. Over the next day or two, appellant telephoned Linda's home numerous times and left threatening messages on her answering machine. In one message, he stated: "you can run, and you can hide, but you can't go on forever, because Charles is coming for your g___d___ ass. Because you, Linda Gates, Dot Gates, Terry Gates, Lori Gates, and all you m___f___, because I am coming for *you*! I am coming for you. You know what I mean? . . .". (italic in original).

On September 6th, a police officer was again dispatched to Linda's home. While listening to the answering machine tapes, the telephone rang. The officer answered the telephone; appellant stated, "[p]ut that whore on the phone. She owes me $40,000." The officer told appellant not to call again and appellant responded, "I'll see her later."

Buster, Linda's nine-year-old son testified that around 7:00 p.m. on September 8, 1999, he saw appellant's car circle the block three times before driving into his yard. Appellant

---

**1.** While appellant's issues arise solely from the penalty phase of trial, we recite the guilt phase evidence in order to place the penalty phase issues in context.

exited the vehicle carrying a "long gun" and "busted through" a front window of Buster's home. Buster testified he ran inside and heard appellant tell his mother "put the mother f___ phone down" and "I got you now, you bitch." While running to his neighbor's home, Buster heard a shot.

Over appellant's objection, the State played a redacted tape recording of several 911 calls.[2] Screaming and three gunshots are heard on the first call. The 911 operator states, "we've been going to this house all weekend."[3] During another call, a neighbor states her neighbor's child had come over and reported his mother's boyfriend was trying to kill his mother. On the last call, Stacy states five people have been shot by appellant. In response to a question from the operator, Stacy says she cannot feel below her waist and does not know where she has been shot.

Sheriff's Department officers arrived at Linda's home. Linda, Stacy, and Dorothy had been shot. Appellant had also been shot.[4] Initially, Linda appeared to be alive. Stacy, wounded in the back, was moving on the living room floor; she inquired about her brother. She stated "Charles" had shot them. Dorothy was dead.

Appellant was lying on the floor in the hallway. An officer testified a shotgun lay beside him; appellant's finger was in the trigger release. Appellant stated, "F___ them. F___ them all. Let them die." The officer took the shotgun from appellant and removed a live shell.[5] Another officer stated appellant stated "Kill me. Finish me off. Finish the job."

A paramedic testified Stacy asked about her brother and begged not to let her die. She stated she was having trouble

---

2. The tape consists of several calls to 911. Appellant requested a large portion of the third call which had been placed by Stacy and which reflects her distress be redacted. Over the State's objection, the trial judge agreed the bulk of the third call should be redacted for purposes of the guilt phase.

3. A second call is unclear. The operator asks "were they fighting?" The response is inaudible.

4. Testimony indicated appellant had a self-inflicted gunshot wound.

5. Four live shotgun shells were found in appellant's pockets.

breathing. The paramedic estimated Stacy died within ten minutes of his arrival.

A detention center nurse testified, while arguing over who would receive medical treatment first, appellant told another inmate, ". . . I've killed three people and don't mind making it four." A detention center officer stated, on the one year anniversary of the shootings, appellant pointed to the newspaper picture of Dorothy and stated, either "I killed this witch" or "I killed this bitch" and referred to her as the devil. He stated he loved Linda and Stacy.

## PENALTY PHASE

At the beginning of the three-day sentencing proceeding, appellant moved to exclude the admission of the unredacted 911 tape, arguing the tape's probative value did not outweigh its prejudicial impact. The trial judge overruled the objection, concluding the tape, while "extremely prejudicial," was relevant to the aggravating circumstance of torture.[6]

After the State played a portion of the 911 tape, Stacy's father identified the scream on the tape as belonging to his daughter. Thereafter, the State played the tape in its entirety. In addition to identifying appellant as the shooter, the tape contains several minutes of Stacy's conversation with the 911 dispatchers. Stacy's breathing is labored and she has difficulty speaking. Several times, Stacy states "I'm hurting" and "please hurry." Her pain and suffering are evident.

Appellant offered several witnesses in mitigation. An expert in clinical social work testified appellant lacked socialization skills, was emotionally immature, dependent on relationships, and that chronic alcohol problems ran in his family. An expert in psychopharmacology testified appellant suffered

---

6. The State alleged the following statutory aggravating circumstances: with regard to Dorothy, two murders by one act or pursuant to one scheme or course of conduct and during the commission of burglary; with regard to Linda, two murders by one act or pursuant to one scheme or course of conduct and during the commission of burglary; with regard to Stacy, two murders by one act or pursuant to one scheme or course of conduct, the murder was committed during the commission of burglary, and the murder was committed while in the commission of physical torture. S.C.Code Ann. § 16-3-20(C)(a)(1)(c) & (h) and (a)(9) (Supp.2001).

from chronic depression, anxiety, and alcohol dependency. He suggested alcohol usage may have caused some brain damage. An expert in neurology testified appellant's MRI revealed a loss of brain tissue.

An expert in psychiatry diagnosed appellant with depression, possible post-traumatic stress syndrome as a result of the shootings, and possible malingering. An expert in forensic psychiatry diagnosed appellant with "adjustment disorder with depressed mood" as a result of the shootings.

Detention center witnesses testified appellant had not caused any problems in jail while awaiting trial. An expert in the field of prisons and corrections testified appellant could be confined in a correctional environment for the rest of his life without harm to himself or others.

Appellant did not testify. He did not make a final statement to the jury.[7]

During closing argument, the solicitor played a portion of the 911 tape (apparently the beginning of the tape with screaming and gunshots). He later played all of the tape.

## ISSUES

I. Did the trial judge err by allowing the solicitor to "exploit" portions of the unredacted version of the 911 tape during the sentencing proceeding?

II. During closing argument, did the solicitor improperly comment on appellant's constitutional right not to testify?

III. Did the solicitor's closing argument inject an arbitrary factor into the jury's deliberations?

---

7. The trial judge instructed the jury on the following statutory mitigating circumstances: 1) appellant had no significant history of prior criminal convictions involving the use of violence against another person, 2) the murder was committed while appellant was under the influence of mental or emotional disturbance, 3) appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, and 4) appellant's mentality at the time of the crime. S.C.Code Ann. § 16–3–20(b)(1)(2)(6)(7) (Supp.2001).

## I.

Appellant argues the trial judge erred by allowing the solicitor to "exploit" that portion of the 911 tape which depicts Stacy's pain and suffering. We disagree.

■ Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE. The relevance, materiality, and admissibility of evidence are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion. *State v. Rosemond,* 335 S.C. 593, 518 S.E.2d 588 (1999).

■ The purpose of the sentencing phase in a capital trial is to direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender. *State v. Owens,* 346 S.C. 637, 552 S.E.2d 745 (2001). Evidence which would ordinarily be inadmissible in the guilt phase of trial may be introduced during the penalty phase. *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986), *cert. denied* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987). During the sentencing phase, the trial judge may permit the introduction of additional evidence of aggravation in order to aid the jury in determining whether to recommend a death sentence. *Id.*

■ The 911 tape was properly admitted as its probative value outweighed its prejudicial nature for two reasons. First, Stacy's recorded statements were relevant as they describe the crime scene immediately after she and her family were shot. Like photographs which are generally admissible in the penalty phase of a capital trial, Stacy's comments show the circumstances of the crime and the character of the defendant. *Id.* (in sentencing proceeding, trial court may admit photographs which depict the bodies of the murder victims in substantially the same condition in which the defendant left them in order to show the circumstances of the crime and the character of the defendant).

██ Second, Stacy's apparent physical distress as revealed by the tape was relevant to establish the aggravating circumstance of physical torture.[8] Even though the pathologist described Stacy's gunshot wounds as painful, Stacy's own expression of her pain and suffering more fully chronicles the last few minutes of her life. *See State v. Rosemond, supra* (use of photographs to corroborate pathologist's testimony victim lived for ten minutes after shooting properly admissible in penalty phase). The 911 tape was properly admitted as it was relevant to the aggravating circumstance of physical torture. *See State v. Johnson,* 338 S.C. 114, 525 S.E.2d 519, *cert. denied* 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) (crime scene photographs relevant to physical torture); *State v. Franklin,* 318 S.C. 47, 456 S.E.2d 357, *cert. denied,* 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (photographs admissible in penalty phase of capital proceeding as relevant to issue of physical torture).

Furthermore, the 911 tape was not so unfairly prejudicial so as to substantially outweigh its probative value. While difficult to hear, Stacy's physical and emotional distress is not so disturbing as to suggest appellant's sentence was made on an improper basis. *State v. Alexander,* 303 S.C. 377, 401 S.E.2d 146 (1991) (unfair prejudice exists where evidence creates tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one).

██ Finally, the solicitor did not unduly exploit the 911 tape during the penalty phase of trial. We agree with appellant that excessive use of an otherwise admissible exhibit could result in a denial of due process. *See Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."). Nevertheless, we conclude the use of the 911 tape during the penalty phase of appellant's trial did not result in a denial of fundamental fairness. During the three day

---

8. The statutory aggravating circumstance of physical torture occurs (1) when the victim is subjected to serious physical abuse before death or (2) when the victim is subjected to an aggravated battery before death. *State v. Elmore,* 279 S.C. 417, 308 S.E.2d 781 (1983), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

proceeding, the prosecution played an excerpt from the 911 tape for identification purposes [9] and the entire tape during the presentation of its evidence. During closing argument, the solicitor again played a portion of the 911 tape and the entire tape. Under the circumstances, the use of the 911 tape did not result in a denial of due process.

## II.

Appellant argues the solicitor improperly commented on his constitutional right not to testify during closing argument. We disagree.

During closing argument, the following transpired:

Solicitor: I'm going to go ahead and play [the answering machine] tape [10] again, and when you listen to that tape, I want you to think about the circumstances of the crime and the characteristics of the Defendant, which is what you all will need to base your decision on.

[Played answering machine tape].

Solicitor: Where is the mitigation evidence in this case? Where is evidence that [appellant] has ever done one good deed or had one decent thought?

Defense Counsel: Your honor, I believe that is burden shifting. He's starting to really—

The Court: No, sir. I'll note your objection. I overrule it. Thank you.

(Underline added).

In part, the trial judge charged the jury as follows:

Ladies and gentlemen, I tell you now, and I emphasize to you again that the fact that the Defendant did not testify in this portion of the trial of this case is not a factor to be considered by you in your deliberation and in your consideration on the question of his sentence. It must not be considered by you in any way. It must not mitigate [sic] against him in any respect because the Defendant has a constitutional right to remain silent, and if he chooses to assert that right, that fact cannot and must not be consid-

---

**9.** *See* Rule 901, SCRE.

**10.** *See* recitation of guilt phase evidence.

ered by you in your deliberations; and so, please reach no inference and draw no conclusion whatsoever from the fact that the Defendant did not testify in this portion of the case. That should not even be discussed by you. The burden of proof on issues that are in dispute, as I have told you, is upon the State, and the Defendant has no obligation to take the stand or testify, and the fact that he did not take the stand and testify is not a factor to be considered by you in your decision in this case.

■ Appellant's argument that the solicitor's comment implicitly referred to his constitutional right not to testify is not preserved for review. At trial, appellant claimed the solicitor's comment improperly shifted the burden of proof; he now claims the comment improperly referred to his right to remain silent. Accordingly, whether the solicitor's comment improperly referred to appellant's right to remain silent is not preserved for review. *State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997) (a party cannot argue one basis in support of motion at trial and another ground on appeal).

■ In any event, the solicitor's statement did not refer to appellant's decision to remain silent. Instead, the statement was a comment on the evidence which had been presented by the prosecution—appellant's hateful and intimidating threats shortly before the murders—and the mitigating evidence which had been presented by appellant. *Johnson v. State*, 325 S.C. 182, 480 S.E.2d 733 (1997) (court considers context in which remark was made).

■ Assuming the comment did refer to appellant's decision not to testify, the error was harmless. While the State may not comment on the defendant's right to remain silent, *see Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), an improper reference is subject to harmless error analysis. *Edmond v. State*, 341 S.C. 340, 534 S.E.2d 682 (2000).

■ The trial court's instruction to the jury that it could not consider appellant's failure to testify in any way and could not use it against him cured any potential error. *Johnson v. State, supra* (even if comment on defendant's failure to testify was improper, trial court's instruction that jury could not

consider defendant's failure to testify in any way and could not use it against him was sufficient to cure any potential error); *State v. Irvin,* 270 S.C. 539, 243 S.E.2d 195 (1978) (possibility jury might have interpreted solicitor's comment as indicating State's evidence was conclusive proof of defendant's guilt was negated by charge). The lone remark did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), *citing Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

## III.

Appellant argues by telling jurors they would be personally responsible for future murders if they did not sentence him to death, the solicitor improperly diverted the jury's attention from consideration of the circumstances of the crime and of his character and improperly injected an arbitrary factor into its consideration. We disagree.

The following transpired during the solicitor's closing argument:

Solicitor: We know that [appellant] didn't snap. We know that he planned this. It was premeditated. He thought about it for days beforehand.

Defense Counsel: Your honor, object to any arguments of deterrence.

The Court: Excuse me. I'm sorry, the objection is to what?

Defense Counsel: I object to any argument that goes into the line of deterrence, Your Honor.

The Court: I don't think it's going to do to that. That's not where you're going with it.

Defense Counsel: Yes, sir, Your Honor.

The Court: All right, under the law he's allowed to argue general deterrence, I think as I understand. Thank you.

Solicitor: He thought about it before he did it. <u>If you impose the death penalty on [appellant] maybe it will cause</u>

somebody else thinking of murder not to do it, and you might spare an innocent life or save a life.

(Underline added).

At the conclusion of the closing arguments, the trial judge noted appellant objected to the State's reference to deterrence. The trial judge overruled the objection.

 The solicitor's comment was clearly an argument on general deterrence. General deterrence arguments are admissible in the penalty phase of a capital trial. *See State v. Shafer*, 340 S.C. 291, 531 S.E.2d 524 (2000), *overruled on other grds.* 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001). The argument did not inject an arbitrary factor (fear or personal responsibility) into the jury's consideration. The solicitor's remark did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright, supra.*

### PROPORTIONALITY REVIEW

 After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of statutory aggravating circumstances for each of the three murders is supported by the evidence. *See* S.C.Code Ann. § 16–3–25 (1985). Further, the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *State v. Hughey*, 339 S.C. 439, 529 S.E.2d 721, *cert. denied* 531 U.S. 946, 121 S.Ct. 345 (2000); *State v. Rosemond, supra; State v. Reed*, 332 S.C. 35, 503 S.E.2d 747 (1998), *cert. denied*, 525 U.S. 1150, 119 S.Ct. 1051, 143 L.Ed.2d 57 (1999); *State v. Kelly*, 331 S.C. 132, 502 S.E.2d 99 (1998), *cert. denied* 525 U.S. 1077, 119 S.Ct. 816, 142 L.Ed.2d 675 (1999); *State v. Atkins*, 303 S.C. 214, 399 S.E.2d 760 (1990), *cert. denied* 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991).

**AFFIRMED.**

TOAL, C.J., MOORE, WALLER, PLEICONES, JJ., concur.