613 S.E.2d 359

The STATE, Respondent,

v.

Angle VAZQUEZ, Appellant.

No. 25975.

Supreme Court of South Carolina.

Heard March 3, 2005.
Decided April 25, 2005.
Rehearing Denied June 2, 2005.

294

Acting Chief Attorney Joseph L. Savitz, III, of the South Carolina Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Jeffrey A. Jacobs, all of Columbia; and John Gregory Hembree, of Conway, for Respondent.

Chief Justice TOAL:

Angle "Angel" Joe Perrie Vazquez (Appellant) was convicted of two counts of murder, one count of armed robbery, four counts of kidnapping, and one count of criminal conspiracy. Appellant was sentenced to death for the murders and thirty years for each count of kidnapping. Appellant appealed.

## FACTUAL/PROCEDURAL BACKGROUND

The events leading up to Appellant's arrest began at the Burger King restaurant (the restaurant) in Myrtle Beach where Appellant worked. One of the restaurant's patrons overheard Appellant using profanity in the restaurant. Appellant cursed at fellow employee Reginald Atkins for trying to feed a patron's dog french fries. The patron, who was with her children, was offended by Appellant's language and phoned the restaurant's district manager from her cell phone while outside the restaurant. The district manager returned the call immediately. Once the patron told the district manager what happened, the district manager asked to speak to the store manager, Joey Williams. As a result of the conversation with the district manager, Williams immediately fired Appellant and refunded the patron's money. Employee Robbie Robertson was called in to complete Appellant's shift. In addition, Kuma Walker was on duty at the restaurant at that time.

Appellant called Shanira Robinson (girlfriend), with whom he shared a house, to tell her that he had been fired. Around 5 p.m. Kevin Cochran drove Appellant home to Conway. At some point during the drive, Appellant phoned his cousin,

Michael Keith Howard.[1] Howard met Appellant at Appellant's home. While inside, Appellant removed a black case from a shelf in the closet. Appellant told his girlfriend that he was going to Lake City and would return later.

However, Appellant and Howard did not go to Lake City. After leaving the house, Appellant and Howard were seen at about 8 p.m. by the bartender at the Nuttin' Butt Horseplay strip club in Myrtle Beach, which is located near the Burger King restaurant where Appellant worked.

Later that evening, Appellant and Howard knocked on the back door of the Burger King restaurant. Atkins and Williams opened the door, but asked them to go around front. Appellant and Howard were seen by Nathan Danner, a patron of the restaurant, inside the restaurant. Appellant was seen arguing with Williams.

While Atkins and Robertson were preparing to close the restaurant,[2] Appellant pulled out a gun and told Atkins and Robertson to get into the restaurant's freezer. Appellant then locked the two in the freezer. After about five minutes, Atkins and Robertson forced their way out of the freezer and fled through the back door.

Atkins and Robertson flagged down a former high school classmate, Ricky Galliard, and asked for a ride to Conway. Galliard took Atkins and Robertson to Atkins' home. Atkins then called his mother and told her about the armed gunman at the restaurant. At that point in time Atkins thought that his coworkers were just holding up the restaurant. Atkins and his mother went back to the restaurant to see if Williams and Walker were alright.

Upon arriving at the restaurant, Atkins discovered that Williams and Walker had been shot and killed. The police arrived, and Atkins told the police that a masked gunman robbed the restaurant. Atkins did not initially indicate he knew the robbers. Atkins was already on probation for gun charges and did not implicate Appellant that night because he

---

1. Howard previously worked at the restaurant and knew most of the staff.

2. The restaurant ordinarily closed at 9 p.m., but Williams wanted to close early that night because it was his last night at the restaurant.

did not want the police to suspect that he had any connection with the events that took place at the restaurant.

When investigating the scene, the police discovered that $837 had been stolen from the restaurant. The police also discovered nine-millimeter shell casings and live nine-millimeter ammunition. The crime scene investigator testified the shootings were done "execution" style.

Appellant and Howard were seen at the Nuttin' Butt Horseplay strip club again between 9 p.m. and 10 p.m., after having left the club for about an hour. Appellant's girlfriend testified that Appellant returned home between 10 p.m. and 11 p.m. to replace the case on the shelf in the closet. Appellant then left.

At approximately 2 a.m. the next morning, a police officer saw Howard and Appellant run a stop sign in Lake City. The officer attempted to pull them over. Howard, who was driving, would not stop. Howard jumped from the car while it was still moving. While attempting to drive the car from the passenger seat, Appellant ran the car into a mobile home. When Appellant was arrested, he had $322.65 in his possession. While in custody, Appellant called his girlfriend to ask her to get rid of his clothes and asked if she found the money he left in her purse.

The day after the killings, Atkins and Robertson admitted to the police they actually saw Appellant and Howard rob the restaurant. This prompted the police to search Appellant's home. At his home, the police discovered a nine-millimeter round on the shelf in the bedroom closet. Later another box of nine-millimeter ammunition was found.

Further, the investigation led police to Kevin Cochran, who owned the case that Appellant stored in his closet. At some point before the police searched the house, Cochran came back to Appellant's house and retrieved the case, which contained a nine-millimeter semi-automatic pistol. Cochran gave the case to the police once he learned the weapon might have been used in the killings.

Ballistic analysis revealed that the bullets that killed Williams and Walker were fired from the nine-millimeter Cochran gave to the police. In addition, the ammunition in

Appellant's closet was the same as the ammunition and shell casings at the crime scene.

After a jury trial, Appellant was convicted on all counts in the indictment. Appellant was sentenced to death, thirty years for each count of kidnapping, thirty years for armed robbery, and five years for conspiracy. This appeal followed and Appellant now raises the following issues for review:

I. Did the trial judge err in refusing to grant a mistrial following the solicitor's closing argument?

II. Did the trial judge err in failing to charge the jury with the statutory mitigators related to intoxication?

## LAW / ANALYSIS

### I. Closing Argument

Appellant argues that the trial judge erred in refusing to grant a mistrial following the solicitor's closing argument. We disagree.

The decision to grant or deny a mistrial is within the sound discretion of the trial judge and will not be overturned on appeal absent an abuse of discretion. *State v. Beckham,* 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999). A mistrial should be ordered only when an incident is so grievous that prejudicial effect cannot be removed. *Id.* The test for granting a new trial based on an improper closing argument is whether the defendant was prejudiced to the extent that he was denied a fair trial. *State v. Brisbon,* 323 S.C. 324, 332, 474 S.E.2d 433, 438 (1996) (citing *State v. Durden,* 264 S.C. 86, 93, 212 S.E.2d 587, 591 (1975)). An instruction is deemed to have cured an error unless, on the facts of the particular case, it is probable that notwithstanding such instruction or withdrawal the accused was prejudiced. *State v. Johnson,* 334 S.C. 78, 89–90, 512 S.E.2d 795, 801 (1999).

In the present case, in his closing argument, the solicitor encouraged the jury to impose the death penalty because Appellant might escape and kill the witnesses on the state's witness list, which the solicitor referred to as a "hit list." Counsel for Appellant objected to the closing remarks

that referred to a threat of escape and a "hit list." [3] As a result, the judge issued a curative instruction that directed the jurors to disregard those comments and to be assured that no threat of escape or any "hit list" existed. The judge's instruction was as follows:

First of all that is there was some argument in the closing by the Solicitor regarding an escape, and let me let you know that that is improper. There is no evidence of any escape nor is there any indication that this Defendant has ever attempted any escape while incarcerated. That is not for your consideration. Please also know that there's no indication that the prisons cannot hold this Defendant. So, any of that argument is not in the record and not for your consideration. Let me make that very clear.

Also, there was some indication of a witness list being or possibly being used as a hit list. Again, this is improper. There is no evidence of any attempt by this Defendant to contact any witnesses, to threaten any witness, to do anything. So, it would be wrong for you and I'm directing you now to not consider and it would be proper for you not to consider. It would be wrong for you to consider any evidence of escape and anything in regard to any alleged hit list.

We find the curative instruction removed any prejudice because it made clear that the jury was not to consider the argument made by the solicitor related to escape and the existence of a "hit list." This instruction removed any prejudice that might have been suffered and afforded Appellant a fair trial.

Therefore, we hold that trial court did not err in refusing to grant a mistrial in light of the its curative instruction.

---

3. The solicitor made other statements in his argument to the jury that referred to Appellant as a domestic terrorist. In addition, the solicitor made statements that drew a correlation between the events of September 11, 2001 and the events in the present case. However, these comments were not objected to. Further, Appellant in his statement to the jury made reference to viewing the juror list used in voir dire. The court in its curative instruction did not address the Appellant's viewing of this list. While we find the solicitor's closing comments to be troublesome, we find they are not preserved for review; however, this issue may be proper for review in post conviction relief.

## II. Intoxication

Appellant argues the trial judge erred in failing to charge the jury with the statutory mitigators related to intoxication because Appellant presented evidence that he drank on the night of the murders.[4] We disagree.

The trial judge must submit for the jury's consideration any statutory mitigating circumstances supported by the evidence. S.C.Code Ann. § 16–3–20(C) (2003). The trial judge must make an initial determination of which statutory mitigating circumstances have evidentiary support and then allow the defendant to request any additional statutory mitigating circumstances supported in the record. *State v. Victor*, 300 S.C. 220, 224, 387 S.E.2d 248, 250 (1989). Absent a request by counsel to charge the mitigating circumstances, the issue is not preserved for review. *State v. Humphries*, 325 S.C. 28, 36, 479 S.E.2d 52, 57 (1996). However, when there is evidence that the defendant was intoxicated at the time of the crime, the trial judge is required to submit the mitigating circumstances in § 16–3–20(C)(b)(2), (6), and (7). *See State v. Stone*, 350 S.C. 442, 449, 567 S.E.2d 244, 248 (2002) (holding the judge is required to submit the mitigating circumstances if there is evidence of intoxication regardless of whether they are requested).

In the present case, the evidence before the court was that Appellant had drinks at a strip club before returning to the restaurant.[5] Appellant presented no evidence that he was intoxicated. The evidence indicated that Appellant may have had drinks, but this is not enough to warrant a charge to the jury for the mitigating factors outlined in § 16–3–20(C)(b)(2), (6), and (7). *See e.g. State v. Drayton*, 293 S.C. 417, 429–30, 361 S.E.2d 329, 337 (1987) (holding that even though drinking

---

4. Specifically, Appellant contends the judge erred in not charging S.C.Code Ann. § 16–3–20(C)(b)(2), (6), and (7) (2003).

5. In addition, in his brief, counsel for Appellant refers to dialogue with Atkins about "getting some," and argues that this testimony suggests they were smoking marijuana. Counsel also refers to the observation of the weak handshake Atkins received as evidence that Appellant was intoxicated. However, this conversation is in reference to Mike Howard, not the Appellant. As a result, there is no evidence in the record that Appellant was intoxicated.

was admitted, there was no evidence that the defendant was intoxicated at the time the crime was committed). Therefore, we hold that the decision of the trial judge to not charge the jury on the mitigating circumstances relating to intoxication was correct.

### III. Kidnapping Convictions

Appellant argues the trial judge erred in sentencing him for the kidnapping of the murder victims.[6] We agree.

 Generally, when a defendant is convicted for murder any sentence for the kidnapping of the victim would be vacated. *See Owens v. State*, 331 S.C. 582, 585, 503 S.E.2d 462, 463 (1998) (holding that a sentence for kidnapping should be vacated when the defendant received concurrent sentence under the murder statute).

In the present case, Appellant was convicted and sentenced on two counts of kidnapping for the murder victims. We hold that the judged erred in sentencing Appellant for the kidnapping of the murder victims. However, the sentences related to the kidnapping of Atkins and Robertson are proper under S.C.Code Ann. § 16–3–910 (2003).

As a result the sentences for kidnapping related to the murder victims, Williams and Walker, are vacated.

### PROPORTIONALITY REVIEW

 As required, we conduct a proportionality review of Appellant's death sentence. S.C.Code Ann. § 16–3–25(C) (2003). The United States Constitution prohibits the imposition of the death penalty when it is either excessive or disproportionate in light of the crime and the defendant. *State v. Copeland*, 278 S.C. 572, 590, 300 S.E.2d 63, 74 (1982). In conducting a proportionality review, we search for similar cases in which the death sentence has been upheld. *Id.;* S.C.Code Ann. § 16–3–25(E) (2003).

 After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor. Furthermore, a review of prior cases

---

6. The prosecution conceded prior to oral argument that the kidnapping sentences related to the murder victims were improper.

shows the death sentence in this case is proportionate to that in similar cases and is neither excessive nor disproportionate to the crime. *See State v. Wise*, 359 S.C. 14, 29, 596 S.E.2d 475, 482 (2004) (holding that the death penalty was warranted for defendant that returned to his former workplace and shot and killed former co-workers during the commission of a violent crime); *State v. Shuler*, 353 S.C. 176, 577 S.E.2d 438 (2003) (holding that the death penalty was warranted for defendant convicted of murders of former live-in lover, lover's thirteen year-old daughter, and lover's mother; aggravating circumstances included two or more persons were murdered pursuant to one scheme or course of conduct, and murder was committed during commission of burglary).

### Conclusion

Based on the above reasoning, we AFFIRM the convictions and sentences for murder and two counts of kidnapping, and VACATE the sentences for the two counts of kidnapping with regard to the murder victims.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.