623 S.E.2d 378

**The STATE, Respondent,**

v.

**Marion BOWMAN, Jr., Appellant.**

**No. 26071.**

Supreme Court of South Carolina.

Heard Oct. 6, 2005.

Decided Nov. 28, 2005.

Rehearing Denied Jan. 6, 2006.

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor David M. Pascoe, Jr., of Summerville, for respondent.

Justice MOORE:

Appellant was charged with murder and third-degree arson. The jury found appellant guilty as charged and he was sentenced to death for the murder charge and a ten-year imprisonment term for the arson charge. We affirm.

## FACTS

On February 17, 2001, Kandee Martin's (victim's) body was found in the trunk of her burned car. She had been shot to death before being placed in the trunk.

The previous day, several people gathered at Hank Koger's house to socialize and drink alcohol. Appellant, who was wearing black pants, arrived at Koger's house around 11:00 a.m. that day. He subsequently left to purchase meat. When appellant returned, he became upset because his gun had been

moved. He accused James Tywan Gadson (Gadson)[1] of taking the gun out of the trash barrel located on Koger's property. Hiram Johnson intervened and told appellant he had moved the gun. The gun was a .380 caliber pistol that appellant had purchased a few weeks before in the presence of Gadson and Travis Felder. After retrieving his gun, appellant left Koger's house.

Later that afternoon, appellant was riding in the car of his sister, Yolanda Bowman, with another woman, Katrina West. Appellant, who had a gun in his back pocket, was sitting in the back seat. He instructed Yolanda to park beside the victim's car. At the time, the victim was speaking to a man. Appellant tried to get the victim's attention, but she indicated to him that he should wait a moment. The man, Yolanda, and Katrina testified as to what appellant said next. The man stated that appellant said, "Fuck waiting a minute. I'm about to kill this bitch." Yolanda stated that appellant said, "Fuck it, that bitch. That bitch be dead by dark." Katrina stated that appellant said, "Fuck that ride. That bitch be dead by dark fall." After appellant's comments, Yolanda drove away and appellant informed her the victim owed him money.

Around 7:30 p.m. that evening, Tywan Gadson saw appellant riding with the victim in her car. They stopped and appellant told Gadson to get in. Gadson had been drinking alcohol since 1:00 and was "feeling in good shape." The victim stopped for gas and they drove off without paying. Appellant allegedly instructed the victim where to drive and instructed her to stop on Nursery Road. Gadson and appellant then exited the vehicle and walked down the road while the victim remained in the car. Appellant told Gadson he was going to kill the victim because she had on a wire. The victim then came down the road, grabbed appellant's arm and stated she was scared. At this point, a car drove by and they all jumped into the woods. Then, the victim started walking to the car with appellant following her. Appellant allegedly shot his gun three times. Gadson stated the victim ran toward him and then stopped and faced appellant and told him to please not shoot her

---

1. In connection with the victim's murder, Gadson had a plea agreement wherein he would plead to accessory after the fact of murder and misprision of a felony and receive a twenty-year sentence.

anymore because she had a child to take care of. Gadson stated appellant shot two more times. The victim fell to the ground and appellant dragged her body into the woods. Gadson stated he jumped into the car.

Afterwards, appellant and Gadson parked the victim's car and later retrieved Yolanda's car. They then went to a store to purchase beer and went back to Koger's house around 8:00 p.m. Later, Gadson stayed at Koger's house and appellant left. Around 11:30 p.m., appellant and Hiram Johnson approached James Gadson, Gadson's father. Appellant gave him money to buy four pairs of gloves.

Appellant, Gadson, Hiram Johnson, and Darian Williams, then drove to Murray's Club in the victim's car. Appellant handed out the gloves for the occupants to wear and stated he had stolen the car. They reached the club around midnight. Once at the club, appellant tried to sell the victim's car. Appellant, according to Hiram Johnson, said, "I killed Kandee, heh, heh, heh." Appellant had a gun with him while at the club. They left the club an hour or two after arriving there.

Three people, Carolyn Brown, Valorna Smith, and Travis Felder, left the club together. They stopped by a gas station about 3:00 a.m. before proceeding to Valorna's home. Not long after they were there, appellant knocked on the door and asked for Travis. Travis left and came back after a few minutes. He seemed normal upon his return.

Travis testified appellant, who was wearing black jeans at the time, stated he needed Travis' help to park a car which turned out to be the victim's car. Travis followed appellant to Nursery Road. Appellant parked the car, went into the woods and pulled the victim's body out by her feet. Appellant then put her body in the trunk. While putting her body in the trunk, Travis saw a gun tucked into appellant's waist. Appellant allegedly told Travis, "you didn't think I did it, did you?" Travis testified appellant also stated, "I killed Kandee Martin." Appellant lit the car on fire. Travis then took appellant to his home and went back to Valorna's house.[2]

---

2. Travis entered into a plea agreement whereby he would be charged with accessory after the fact to third degree arson in exchange for his testimony.

A resident of Nursery Road who had previously heard gunshots was awakened late in the night by a loud noise. He investigated and discovered a car on fire. The fire was reported at 3:54 a.m. There were .380 Winchester cartridge casings found not far from the scene. The casings, a blood stain, and a shoe were located with the help of a man who had driven by and seen the victim's car stopped on the road around 8:00 p.m. the previous evening.

The next day, police arrested appellant at his wife's house and seized his black pants. His wife testified he had been wearing the pants when he arrived at the house. ·They found a wristwatch belonging to the victim in appellant's pants.

After the police left, appellant's wife, Dorothy Bowman, found appellant's gun in a chair in her home. She allegedly gave the gun to appellant's father. The next day, appellant's father, Yolanda, and appellant's other sister, Kendra, took the gun and dropped it off a bridge into the Edisto River. It was later retrieved from the Edisto River and determined to be the gun that was used in the murder.

The arson investigator testified there was the presence of a heavy petroleum product on appellant's jeans, but the product was not gasoline. The items found in the car had gasoline on them indicating that was the product used to start the fire.

While the following evidence did not come out during the guilt phase, during the sentencing phase, a video was introduced during Travis Felder's testimony. The video showed Travis purchasing gasoline in a gasoline can at about 3:14 a.m. Appellant was not with him on the video. Travis stated appellant gave him the can for the gas and told him he needed $2–3 worth. When appellant set fire to the victim's car, he retrieved the gas can from Travis' car.

At the conclusion of the guilt phase, the jury found appellant guilty of murder and third-degree arson.

## ISSUES

I. Did the trial court err by failing to instruct the jury on the substantial impairment mitigating circumstance?

II. Did the trial court err by refusing to grant a mistrial
 when the solicitor cross-examined a witness about the
 possibility of escape and did the trial court abuse its
 discretion by allowing the solicitor on re-cross exami-
 nation of the witness to ask him about prison condi-
 tions?

III. Was the trial court without subject matter jurisdiction
 to try appellant for capital murder?

IV. Did the trial court err by refusing to suppress the
 watch and liquid material found on appellant's pants
 because the pants were seized during an allegedly
 illegal arrest?

## DISCUSSION

### I

During the sentencing phase of appellant's trial, appel-
lant offered mitigating evidence that there was a history of
heavy alcohol use on his mother's side of the family. In the
fourth grade, he began experimenting with alcohol by stealing
sips from his uncle's drinks. By age 14, appellant was selling
drugs and drinking on the weekends. Subsequently, he was
drinking every day.

At the end of the sentencing phase, appellant requested the
trial court charge the mitigating circumstance that his capaci-
ty to appreciate the criminality of his conduct or to conform
his conduct to the requirements of the law was substantially
impaired.[3] The State objected that evidence of this mitigating
circumstance was not before the jury because appellant did
not want to bring up a diagnosis, if any, regarding a mental
health condition that he might have. The trial court ruled the
record was void of the requested mitigating factor.

The trial court charged the jury on the mitigating circum-
stances that appellant did not have a significant history of
prior criminal convictions involving the use of violence against
another person, that the jury should consider appellant's age
or mentality at the time of the crime, and that the jury should
consider any other non-statutory mitigating factors.

---

3. S.C.Code Ann. § 16–3–20(C)(b)(6) (2003).

494

· Appellant argues the trial court erred by failing to charge the jury on the statutory mitigating circumstance regarding substantial impairment based on the evidence of appellant's history of substance abuse, the evidence appellant had been drinking the day of the murder, and the evidence of the "party atmosphere" throughout the day.

The trial court must submit for the jury's consideration any statutory mitigating circumstances supported by the evidence. *State v. Vazquez,* 364 S.C. 293, 613 S.E.2d 359 (2005). The trial judge must make an initial determination of which statutory mitigating circumstances have evidentiary support and then allow the defendant to request any additional statutory mitigating circumstances supported in the record. *Id.* Absent a request by counsel to charge the mitigating circumstances, the issue is not preserved for review. *Id.* However, when there is evidence the defendant was intoxicated at the time of the crime, the trial court is required to submit the mitigating circumstances in § 16-3-20(C)(b)(2), (6), and (7). *Id.* (citing *State v. Stone,* 350 S.C. 442, 567 S.E.2d 244 (2002) (holding trial court is required to submit mitigating circumstances if there is evidence of intoxication regardless of whether they are requested)); *see also State v. Pierce,* 289 S.C. 430, 346 S.E.2d 707 (1986) [4] (evidence of voluntary intoxication is proper matter for consideration by jury in mitigation of punishment). Where there is evidence the defendant was extremely intoxicated during the commission of the crime, the failure to instruct the jury on statutory mitigating circumstances (2), (6), and (7) [5] is not harmless error. *State v. Stone, supra.*

In the present case, there was evidence presented that appellant possessed beer at different points in the day but none of the evidence indicated appellant was drinking the beer. There was evidence appellant had a history of alcohol

---

4. *Overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

5. The section 16-3-20(C)(b)(2) mitigator states the murder was committed while the defendant was under the influence of mental or emotional disturbance. The section 16-3-20(C)(b)(7) mitigator states the age or mentality of the defendant at the time of the crime. The trial court in the instant case charged the latter mitigating circumstance to the jury.

and drug abuse; however, his history is irrelevant to whether he was in fact intoxicated on the day of the murder. Appellant presented no evidence he was actually intoxicated at the time of the crime. The evidence indicated appellant may have been drinking that day, but this is not enough to warrant a charge to the jury for the mitigating factor outlined in § 16–3–20(C)(b)(6). *See, e.g., State v. Vazquez, supra* (holding that even though drinking was admitted, there was no evidence defendant was intoxicated at time crime was committed; therefore, court did not err by failing to charge the jury on mitigating circumstances relating to intoxication); *State v. Drayton,* 293 S.C. 417, 361 S.E.2d 329 (1987), *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1060, 98 L.Ed.2d 1021 (1988) (same). *Cf. State v. Young,* 305 S.C. 380, 409 S.E.2d 352 (1991) (where there is evidence defendant was intoxicated at time of crime, trial judge required to submit mitigating circumstances relating to intoxication). Therefore, the trial court's decision not to charge the jury on the mitigating circumstances relating to intoxication was not in error.

## II

Appellant argues the trial court erred by refusing to grant a mistrial when the State asked James Aiken, a correctional consultant testifying on behalf of appellant, about the possibility of escape and by allowing the State, on re-cross examination, to ask Aiken about prison conditions.

During the sentencing phase, Aiken testified that, as a consultant, he assists in the classification of prisoners and in the training of prison wardens. He testified that if appellant received a life without parole sentence, then he would stay in prison until he was dead. Aiken stated appellant has adjusted relatively well to jail in the past and that he could adapt to prison life in the future. Aiken mentioned appellant would be kept behind gun towers, fences, bars, and concrete.

On cross-examination, Aiken testified inmates can move to less restrictive environments within prison based on their behavior. He stated appellant would never be allowed in a work-release program. He further stated he did not anticipate appellant being disruptive in prison.

On redirect examination by appellant's attorney, Aiken testified appellant would not be going to a "kiddy camp" or a place where he could have "picnic lunches outside the gate." Aiken stated appellant would work because the inmates are usually required to perform cheap labor to pay back society. He further testified that while appellant would stay in prison for life, he could salvage his life and have redeeming qualities.

On re-cross examination by the State, Aiken repeated his testimony that appellant would never get out of prison if he received a life without parole sentence. The State then asked, "During the time that you have been affiliated with the Department of Corrections of South Carolina, how many inmates have escaped?" Appellant immediately objected. A bench conference was held outside the presence of the jury. The State argued appellant opened the door to the testimony by eliciting testimony from Aiken that appellant "will never get out of that prison."

The trial court concluded the escape testimony should not be presented to the jury. The trial court distinguished appellant's situation from the situation in *State v. Plath,* 281 S.C. 1, 313 S.E.2d 619, *cert. denied, Arnold v. South Carolina,* 467 U.S. 1265, 104 S.Ct. 3560, 82 L.Ed.2d 862 (1984), because Plath himself was an escapee [6] and, therefore, escape testimony was relevant in that case. Appellant made a motion for mistrial of the sentencing phase based on the escape question. The court denied the motion and offered to give a curative instruction instead. The court instructed the jury upon their return:

> ... there was a question that was asked before you left and I have ruled that the question was not a proper question and I'm going to ask you to disavow that from your minds for this reason: There are two sentences that you will concern yourselves and we're going to have an opportunity during my charge to talk about them at great length, but for this moment I will tell you, and I think I am reminding you based on the instructions that you have received even preliminarily, but there are two sentences that you will

---

**6.** In fact, Plath was not an escapee, but his co-defendant John Arnold, who was also an appellant in the *Plath* case, was the escapee. *Plath,* 281 S.C. at 7, 313 S.E.2d at 622–623.

concern yourselves. One, the death penalty, and the other is life imprisonment without the possibility of parole. The statute says until the death of the defendant. Those would be the two sentences that you will concern yourselves.

Prior to the motion for mistrial, the State requested that, because appellant had established prison was not a "kiddy camp" and that appellant would probably not be in super maximum security, the State would like to pursue those areas by asking about certain conditions of the general population, such as the work conditions appellant had already covered. The court ruled the State could do so. Appellant responded, "We're on recross, Judge." The court replied that it understood, but ruled the State could go into those areas because those issues "are certainly before the jury at this point."

The re-cross examination of Aiken continued after the curative instruction was given. Aiken testified appellant would not be in super maximum security and he would be able to work and earn a small amount of money. Aiken testified appellant would most likely have certain opportunities in prison, such as bible study, continuing his education, participating in anger management programs, playing basketball, exercising, reading books, and watching movies and possibly television. Aiken made it clear that all of these activities would occur under continuous security.

*Mistrial due to Escape Question*

■ We have held in the past that evidence of a prior escape is proper reply to a defendant's presentation of evidence of his good conduct while in prison. *See State v. Woomer*, 278 S.C. 468, 299 S.E.2d 317 (1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1413 (1983). We have also held that evidence the defendant was an escapee at the time he committed a murder was admissible evidence in the sentencing phase. *See State v. Plath, supra.* Appellant's situation, however, is distinguishable from *Woomer* and *Plath* in the sense that he has never been an escapee and there was no evidence he had ever attempted to escape confinement. The trial court therefore properly refused to allow Aiken to answer the State's question.

We find the court's curative instruction removed any prejudice because it made it clear that the question asked by the

State was improper and asked the jury to disavow that question from their minds. Further, the curative instruction, without mentioning the contents of the escape question again, emphasized that the jury was to be concerned with only two sentences: death and life without the possibility of parole, and that life without parole meant "until the death of the defendant." This instruction was sufficient to cure any alleged prejudice caused by the State's question. Therefore, we hold the trial court did not err by refusing to grant a mistrial in light of its curative instruction. *See State v. Vazquez,* 364 S.C. 293, 613 S.E.2d 359 (2005) (mistrial should be ordered only when an incident is so grievous that prejudicial effect cannot be removed).

*Prison Conditions Questions*

■ Appellant argues the trial court erred by allowing the State, on re-cross examination, to ask Aiken about prison conditions.

We find this issue is not preserved for review because appellant did not raise this issue to the trial court before the testimony was presented and did not make a contemporaneous objection when the testimony was actually elicited. Further, the trial court did not rule on this issue as now stated by appellant. *See State v. Moore,* 357 S.C. 458, 593 S.E.2d 608 (2004) (to be preserved for appeal, issue must be raised to and ruled on by trial court); *State v. Byram,* 326 S.C. 107, 485 S.E.2d 360 (1997) (party cannot argue one ground below and then argue different ground on appeal). *See also State v. Johnson,* 363 S.C. 53, 609 S.E.2d 520 (2005) (to preserve an issue for review there must be a contemporaneous objection that is ruled upon by the trial court).

■ We take this opportunity, however, to caution the State and the defense that the evidence presented in a penalty phase of a capital trial is to be restricted to the individual defendant and the individual defendant's actions, behavior, and character. Generally, questions regarding escape and prison conditions are not relevant to the question of whether a defendant should be sentenced to death or life imprisonment without parole. We emphasize that how inmates, other than the defendant at trial, are treated in prison; and whether other inmates have escaped from prison, is inappropriate

evidence in the penalty phase of a capital trial. We admonish both the State and the defense that the penalty phase should focus solely on the defendant and any evidence introduced in the penalty phase should be connected to that particular defendant.

### III

Appellant argues the trial court lacked subject matter jurisdiction to sentence him to death because the murder indictment did not allege an aggravating circumstance. He argues that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), holds that aggravating factors are elements of the offense of capital murder that must be charged in the indictment.

We have recently addressed this issue in several cases. *See State v. Crisp,* 362 S.C. 412, 608 S.E.2d 429 (2005) (under South Carolina law, aggravating circumstances need not be alleged in murder indictment); *State v. Wood,* 362 S.C. 135, 607 S.E.2d 57 (2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 2942, 162 L.Ed.2d 873 (2005) (same); *State v. Downs,* 361 S.C. 141, 604 S.E.2d 377 (2004) (same). As stated in those cases, the aggravating factors enumerated in S.C.Code Ann. § 16–3–20(C)(a) (2003) are sentencing factors, not elements of murder, and they need not be in the indictment. Therefore, the instant indictment is valid.

### IV

Appellant argues his pants were seized during an illegal warrantless arrest and that the watch and liquid material found in and on the pants should have been suppressed.

The murder occurred in Dorchester County. Appellant was arrested, on February 17, 2001, at his wife's home in Orangeburg County pursuant to an Orangeburg County arrest warrant for receiving stolen goods that was issued on December 1, 2000.

On the morning following the murder, several officers went to the residence of appellant's wife, Dorothy. The officers present were a Branchville police officer, an Orangeburg County deputy, and two officers from Dorchester County.

The Branchville officer testified that, although he did not have the original, he had a certified copy of the Orangeburg County warrant and that the officers went to Dorothy's house [7] pursuant to that warrant. He further testified Dorothy invited him into the house and he stepped inside and told her they were looking for appellant. He stated he showed Dorothy a copy of the arrest warrant. Dorothy replied to him that she did not know where appellant was and indicated it was okay for the officers to look around. The Branchville officer stated he did not pull out a consent to search form before searching Dorothy's home.

Dorothy confirmed the officers said they had a warrant and that she stated the officers could come in and search her home. Dorothy testified she let the officers in voluntarily and they had her permission to search the home.

Appellant was found hiding behind a bed. He was arrested pursuant to the receiving stolen goods warrant at that time and was transported to the Branchville Police Department. At the time of his arrest, appellant was wearing only underwear and he asked for his clothes. Before his wife could give him his black pants, an officer intervened to search the pants. The officer wanted to check the pants for weapons for safety purposes. When the officer found a lady's watch inside the pants, the officer decided the pants needed to be confiscated.

Appellant argues the trial court should have suppressed the evidence seized at Dorothy's home because the arrest was unlawful and because Dorothy had not consented to the search.

Initially, the State argues this issue is not preserved for review because appellant did not renew his objection to the evidence when it was received at trial.

In most cases, making a motion in *limine* to exclude evidence at the beginning of trial does not preserve the issue for review because a motion in *limine* is not a final determination. *State v. Forrester*, 343 S.C. 637, 541 S.E.2d 837 (2001); *State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57

---

7. Appellant and his wife both testified appellant did not live at the wife's home and that she had been living there for only a short time before appellant's arrest.

(1996), *cert. denied,* 520 U.S. 1277, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997) (same). The moving party must make a contemporaneous objection when the evidence is introduced. *Id.* An exception to this rule is where a judge makes a ruling on the admission of evidence on the record immediately prior to the introduction of the evidence in question. In that case, the aggrieved party does not need to renew the objection. *State v. Forrester, supra.*

 Appellant did not renew his objection when the evidence of the watch found inside the pants and the petroleum on the pants was introduced. The trial court's decision to allow the evidence was not made immediately prior to the introduction of the evidence in question. Therefore, this issue is not preserved for appellate review.

 Despite the lack of preservation, we will address the merits. When reviewing a Fourth Amendment search and seizure case, an appellate court must affirm the trial court's ruling if there is *any* evidence to support the ruling. *State v. Missouri,* 361 S.C. 107, 603 S.E.2d 594 (2004). The appellate court will reverse only when there is clear error. *Id.*

Appellant was legally arrested pursuant to a valid warrant. The record indicates a warrant for receiving stolen goods had been issued prior to appellant's arrest and that the arresting officer, while possibly not in possession of the warrant itself, was acting pursuant to the warrant when the arrest was made. Consequently, the trial court did not err by refusing the motion to suppress on this ground. *See State v. Holmes,* 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied,* 517 U.S. 1248, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996) (arrest of defendant properly made and clothes seized from defendant at time of arrest could be admitted in murder prosecution, where warrant had been issued prior to arrest and arresting officer was acting pursuant to warrant, even though warrant not physically in officer's possession); *State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991), *cert. denied,* 502 U.S. 1103, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992) (arresting officer who was aware but not in possession of valid arrest warrants was authorized to enter motel room to make arrest).

■■■ Further, appellant argues the motion to suppress should have been granted because his wife did not consent to the search of her home. This argument is without merit because appellant's wife specifically testified she gave the officers permission to enter and search the home. There is no evidence to support appellant's assertion. *Cf. Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (warrantless searches of a home are impermissible absent consent or exigent circumstances).

■■■ Additionally, the search of appellant's pants and the seizure of those pants and the watch were permissible as a search incident to arrest. After being arrested, appellant requested that he be allowed to put on his pants. However, before being given the pants, the officer determined the pants should be searched for "safety purposes." This search was reasonable. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (ample justification for a search of arrestee's person and area within his immediate control, that is, the area from within which he might gain possession of a weapon or destructible evidence); *State v. Crowe,* 258 S.C. 258, 188 S.E.2d 379, *cert. denied,* 409 U.S. 1077, 93 S.Ct. 691, 34 L.Ed.2d 666 (1972) (same). *See also State v. Brown,* 289 S.C. 581, 347 S.E.2d 882 (1986) (search may be conducted incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest).

Accordingly, the trial court did not err by refusing to suppress the evidence as requested by appellant. *See State v. Missouri, supra* (appellate court must affirm trial court's ruling if there is *any* evidence to support the ruling).

## PROPORTIONALITY REVIEW

■■■ Under State law, S.C.Code Ann. § 16–3–25(C)(3) (2003) requires us to determine in a death case "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." There is no requirement the sentence be proportional to any particular case; however, death sentences have been imposed in similar cases. *See State v. Binney,* 362 S.C. 353, 608 S.E.2d 418, *cert. denied,* —— U.S. ——, 126 S.Ct.

115, 163 L.Ed.2d 125, 2005 WL 1333888 (2005); *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689, *cert. denied,* 519 U.S. 972, 117 S.Ct. 402, 136 L.Ed.2d 316 (1996). Accordingly, appellant's sentence is not disproportionate under State law.

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.