# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Gabrielle Oliva Lashane Davis-Kocsis, Appellant.

Appellate Case No. 2019-000687

———————————

Appeal From Berkeley County
Maite Murphy, Circuit Court Judge

———————————

Opinion No. 5908
Heard February 16, 2022 – Filed May 4, 2022

———————————

## AFFIRMED

———————————

Appellate Defender Susan Barber Hackett, of Columbia,
and Jason Scott Luck, of Luck VI Ltd. Co. d/b/a Jason
Scott Luck, Attorney at Law, of Bennettsville, both for
Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Julianna E. Battenfield, both of
Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston, all for Respondent.

———————————

**LOCKEMY, A.J.:** Gabrielle Oliva Lashane Davis-Kocsis (Kocsis) appeals her
convictions for murder, first-degree burglary, criminal conspiracy, and two counts
of kidnapping and aggregate fifty-year sentence. On appeal, Kocsis argues the trial
court erred in (1) failing to charge the current law of burglary, (2) failing to direct

verdicts on the burglary and kidnapping charges, (3) sentencing her for kidnapping in light of her murder sentence, and (4) admitting a 911 call. We affirm.

## FACTS

In 2016, a Berkley County grand jury indicted Kocsis for the murder of Mark Connor (Victim), first-degree burglary involving Rosemary Hoffberg and her home, criminal conspiracy, and the kidnappings of Alexis Nicole Murray and Whitney Renee Chance.

Pretrial, Kocsis moved to suppress State's Exhibit 1, which is a recording of a 911 call that consisted of Murray requesting emergency services to respond quickly, telling Victim not to die from his gunshot wound, describing that she and others had been pepper sprayed and Victim was shot, identifying Kocsis as a perpetrator, and stating they were asleep when Kocsis and the others came into the home. Chance can also be heard on the recording. Relying on Rule 403, SCRE, Kocsis argued the 911 call would "stir up the passions and prejudices of the jury via using emotion rather than facts." The State asserted all 911 calls are emotional, this call was not substantially prejudicial, and the 911 call provided a "real time" account immediately after the shooting. The trial court found State's Exhibit 1 admissible for "corroborative purposes and establishing the elements of the offense[s]" and stated "although [State's Exhibit 1] may be prejudicial, the probative value outweigh[ed] the prejudicial effects."[1]

In her opening statement, Kocsis asserted many of the witnesses, including herself, used methamphetamine, and she urged the jury to consider the credibility of the witnesses, their motives in testifying she was responsible for organizing how Victim was killed, and if she were "some drug leader."

During the first witness's testimony, the trial court admitted State's Exhibit 1 over Kocsis's renewed Rule 403 objection. Thereafter, the State presented evidence that Kocsis was a drug dealer, Victim stole over a thousand dollars and a motorcycle from her, and Kocsis "put a hit on" Victim.

On the day of Victim's death, Victim was staying at "Ms. Rose's" home, and there were several other people there, including Murray, Chance, Richard Curtis, Nick Varner, and Ms. Rose. Witnesses described Ms. Rose's home as a drug or "trap house." The trial court admitted photographs of Ms. Rose's home, which depicted

---

[1] The court had not listened to State's Exhibit 1 at the time of the pretrial ruling.

a house that someone was living in—there was a beer can, cleaning supplies, furniture, and a calendar flipped to the correct month on the day of the incident. Two witnesses testified Ms. Rose slept in the home, including on the night in issue.

According to the State's witnesses, Kocsis, Matt Grainger, Grayson Griffin, and others broke into Ms. Rose's home in the early morning hours by breaking a window and kicking a door in[2] while they were looking for Victim. These witnesses detailed Kocsis sprayed bear mace, or pepper spray, inside the home and indicated to Grainger to shoot Victim. Thereafter, a gun went off, and Kocsis and the other intruders fled Ms. Rose's home.[3]

According to Varner, he told Chance to call 911—although Murray was the one who actually called 911 on State's Exhibit 1. Varner testified he told Chance to tell law enforcement that they were at Ms. Rose's home and stated law enforcement would know the location. Deputy Kimberly Vandiver, of the Berkeley County Sherriff's Office, testified she was one of the first responders and she spoke with "[t]he owner of the residence."

Murray testified that during the break-in, she was in a bedroom and did not feel free to leave because one of the men Kocsis was with was pointing a gun at her face. Chance, who was in the living room, also testified she did not feel free to leave during the incident; Chance emphasized the mace caused her pain and she had difficulty breathing because of it.

Melissa Freeman, who was with the intruders, testified Kocsis "orchestrated" the incident, and Freeman believed Kocsis and the others were only going to scare Victim. Griffin testified he sold drugs to Kocsis and did not know that someone was going to be killed when they went to Ms. Rose's home. However, Curtis testified he overheard a phone call between Griffin and Kocsis in which Griffin told Kocsis that "they [could not] let stuff like this happen and [let] people get away with it."

During cross-examination of many of the State's witnesses, Kocsis questioned the witnesses about their credibility, focusing on their drug usage, criminal records, possible benefits from testifying, and their recollections of what occurred.

---

[2] Griffin explained someone may have opened the door when Grainger was kicking the door.

[3] Grainger pled guilty to murder.

At the close of the State's case, Kocsis moved for a directed verdict. Specifically, she argued (1) "Rosemary Hoffberg" had not testified, her ownership and identity remained unknown, and witnesses broadly identified "Miss Rose"; (2) burglary required "proof of a possessory interest" and an "expectation of peace and security"; and (3) the State failed to present evidence that Kocsis knew Murray and Chance would be in the home. The trial court denied Kocsis's motion, finding there was evidence that this was a dwelling where Ms. Rose slept, Kocsis and the others broke into the dwelling, and Murray and Chance testified they did not feel free to leave.

Kocsis testified in her own defense and confirmed Victim took her money and motorcycle. According to Kocsis, the money that Victim stole actually belonged to Griffin because Griffin sold her drugs on credit. Kocsis asserted Griffin threatened that if she could not obtain the money from Victim, he "was going to take it out on [her]." Kocsis testified Griffin took out the hit on Victim, but Kocsis later acknowledged she shared information about the hit. According to Kocsis, she received a text message that Victim was at Ms. Rose's home, and Griffin wanted her to tell him where the home was located. She stated Griffin gave her a pistol to give to Grainger, which she later gave to Grainger, and Griffin tried to give her a gun to use personally, but she declined to take it. Kocsis testified that upon arriving to Ms. Rose's home, Griffin told her that he planned to smash a window to cause everyone to run out. Kocsis stated Griffin broke a window and Grainger attempted to kick the door in. Kocsis explained the door started coming open, and Ms. "Rose Hoffberg" was "standing behind the door." Kocsis identified Ms. Rose as the "owner of the house" and admitted she had "heard" about "Miss Rose's house"; Murray previously testified she saw Kocsis at Ms. Rose's home on several occasions over a period of three years.

Kocsis stated she entered the home and looked for Victim, and upon seeing Victim in the backroom, she sprayed him with the mace. According to Kocsis, Grainger believed Victim was "rushing at him"; Grainger fell in a hole in the floor, and the gun went off. Kocsis denied telling Grainger to shoot Victim. Kocsis asserted it was Griffin's idea to find Victim, she did not want Victim dead, and she did not have a choice about going to the home. Kocsis acknowledged the purpose of going to Ms. Rose's home was to obtain the stolen money. Kocsis denied the intention was to kill Victim and asserted the incident was not planned.

Curtis Jamison also testified in Kocsis's defense and asserted Kocsis was afraid of Griffin. The defense rested, and the trial court instructed the parties to send it jury instructions. In a memorandum, Kocsis requested the trial court charge Judge

Ralph King Anderson's proposed jury charge[4] defining "without consent" after our supreme court issued *State v. Singley*[5] and an additional paragraph about an expectation of being safe and secure. The memorandum did not state any reasoning beyond that it was the "current South Carolina law." The requested charge stated the following:

> The entry must have been without consent. "Enters a dwelling without consent" means to enter "without the consent of the person in lawful possession." In addition to the normal meaning of entry without consent, the phrase also includes entering by using deception, artifice, trick, or misrepresentation to gain consent to enter from the person in lawful possession.
>
> A person in "lawful possession" has custody and control of, and the right and expectation to be safe and secure in, the dwelling in question.

The trial court held an off-the-record charge conference, and when on the record, Kocsis referenced her proposed burglary charge and only stated "we would object based on that." The trial court denied Kocsis's request, stating it thought the "[c]ourt's [standard] charge cover[ed her] concerns." Additionally, Kocsis renewed her directed verdict motion, which the trial court denied.

In her closing argument, Kocsis emphasized many of the State's witnesses were drug addicts, asserted they were liars, attacked their credibility, and contended their memories were faulty. Kocsis specifically went witness by witness in her closing argument and highlighted aspects about the individuals.

The trial court issued the following first-degree burglary charge:

> The defendant is charged with burglary in the first degree. The State must prove beyond a reasonable doubt that the defendant entered a dwelling without consent.

---

[4] Ralph King Anderson, Jr., *South Carolina Request to Charge—Criminal*, § 2-13 (2d ed. 2012).
[5] 392 S.C. 270, 709 S.E.2d 603 (2011).

A dwelling is any building or portion of a building in which a person ordinarily sleeps. A building constructed as a dwelling that has never been occupied cannot be considered a dwelling for purposes of burglary. But a building is a dwelling even if the residents are temporarily absent from the building.

In order to prove that the defendant entered the building, the State does not have to show that the defendant's entire body entered the building. The smallest entry is sufficient. It may be any part of the body, such as a hand or a foot, or even an instrument, such as a hook or other instrument.

In addition, the State does not have to prove that force was used to gain entry. If a person enters a building by using deception, artifice, trick, or misrepresentation to get consent to enter, this is an entry without consent.

Next, the State must prove beyond a reasonable doubt that the defendant intended to commit a crime, either a felony or a misdemeanor, at the time of entry. Mere entry into a dwelling without consent is not burglary. If the intent to commit a crime is formed after the entry, it is not burglary.

On the other hand, if the defendant intended to commit a crime at the time of the entry, it is a burglary even if the intent was abandoned after the entry. It does not matter that the intended crime was not completed.

Intent may be shown by acts and conduct of the defendant and other circumstances from which you may naturally and reasonably infer intent.

Additionally, the trial court charged the jury on the applicable aggravating circumstances. It also charged accomplice liability and instructed the jury to consider each offense separately:

> Each indictment charges separate and distinct offenses. You must decide each indictment separately on the evidence and law applicable, uninfluenced by your decision as to any other indictment. The defendant may be convicted or acquitted on any or all of the offenses charged.
>
> You will be asked to write a separate verdict of guilty or not guilty for each indictment.

After the trial court charged the jury, Kocsis "reiterate[d her] previous exceptions," which the trial court denied.

During its deliberations, the jury requested to listen to State's Exhibit 1 again, which the trial court permitted. The jury found Kocsis guilty as indicted, and the trial court sentenced Kocsis to an aggregate sentence of fifty years' imprisonment, including for the murder of Victim and the kidnappings of Murray and Chance.

Thereafter, Kocsis moved for a new trial, asserting (1) "there was not [the] requisite evidence to prove any sort of legal possession necessary to prove a burglary charge"; (2) "there was [not] sufficient evidence to support a mens rea aspect of the kidnapping charge[s]"; (3) *State v. East*[6] implied for a jury to "convict a defendant of kidnapping that is incident to another crime, . . . there need[ed] to be a specific charge telling them that there must be requisite intent to commit two separate offenses"; and (4) she "would like . . . like to reincorporate" her prior objection to the jury charge.

The trial court denied her motion, finding there was sufficient evidence for the jury to return the verdicts it did, the jury was charged to consider each element of each offense separately, and it charged all of Kocsis's requested charges except for the burglary charge. This appeal followed.

**ISSUES ON APPEAL**

1. Did the trial court err in charging the jury on the law of burglary?

2. Did the trial court err in failing to grant directed verdicts on the burglary and kidnapping charges?

---

[6] 353 S.C. 634, 578 S.E.2d 748 (Ct. App. 2003).

3. Did the trial court err in sentencing Kocsis for kidnapping in light of her murder sentence?

4. Did the trial court err in admitting State's Exhibit 1 in violation of Rule 403?

**LAW/ANALYSIS**

**I.     Burglary Jury Charge**

Kocsis argues the trial court erred in not issuing her requested burglary charge because the trial court's charge did not comply with Judge Anderson's interpretation of *Singley*.  She further avers the issues of an "expectation to be safe and secure" and whether the home could have been burglarized were integral to her case.  We disagree.

"[T]he trial court is required to charge only the current and correct law of South Carolina." *State v. Marin*, 415 S.C. 475, 482, 783 S.E.2d 808, 812 (2016) (quoting *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011) (alteration in original)).  "The law to be charged must be determined from the evidence presented at trial." *Id.* (quoting *Brandt*, 393 S.C. at 549, 713 S.E.2d at 603).  "An appellate court will not reverse the trial [court's] decision regarding a jury charge absent an abuse of discretion." *Id.* (quoting *State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010)).  "In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *Id.* (quoting *Brandt*, 393 S.C. at 549, 713 S.E.2d at 603).  "The substance of the law is what must be instructed to the jury, not any particular verbiage." *Id.* (quoting *State v. Smith*, 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994)).  "To warrant reversal, a trial [court's] refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Brandt*, 393 S.C. at 550, 713 S.E.2d at 603 (quoting *Mattison*, 388 S.C. at 479, 697 S.E.2d at 583).

Section 16-11-311(A) of the South Carolina Code (2015) provides the statutory crime of first-degree burglary.  In pertinent part, the statute states: "A person is guilty of burglary in the first degree if the person enters a dwelling without consent and with intent to commit a crime in the dwelling . . . ." *Id.*  "'Dwelling' means its definition found in [s]ection 16-11-10 [of the South Carolina Code (2015)] and also means the living quarters of a building which is used or normally used for sleeping, living, or lodging by a person." S.C. Code Ann. § 16-11-310(2) (2015). Section 16-11-10 defines dwelling as "any house, outhouse, apartment, building,

erection, shed or box in which there sleeps a proprietor, tenant, watchman, clerk, laborer or person who lodges there with a view to the protection of property shall be deemed a dwelling house . . . ." "'Enters a building without consent' means: (a) To enter a building without the consent of the person in lawful possession; or (b) To enter a building by using deception, artifice, trick, or misrepresentation to gain consent to enter from the person in lawful possession."  S.C. Code Ann. § 16-11-310(3) (2015).

"The law of burglary is primarily designed to secure the sanctity of one's home, especially at nighttime when peace, solitude and safety are most desired and expected."  *State v. Brooks*, 277 S.C. 111, 112, 283 S.E.2d 830, 831 (1981).  *See generally* 4 William Blackstone, *Commentaries* *223 (Wilfrid Prest ed. 2016) ("Burglary, or nocturnal housebreaking, *burgi latrocinium* [robbery of the castle], which by our antient law was called *hamesecken*, as it is in Scotland to this day, has always been looked upon as a very heinous offense: not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation . . . ." (first alteration in original)).

In *Singley*, our supreme court was presented with the issue of whether a defendant who owned a legal interest in a house was precluded from being convicted of burglary of that home as a matter of law.  392 S.C. at 273, 709 S.E.2d at 605.  Our supreme court found the defendant could be convicted because "the proper test is whether, under the totality of the circumstances, a burglary defendant had custody and control of, and the right and expectation to be safe and secure in, the dwelling burglarized."  *Id.* at 277-78, 709 S.E. 2d at 606-07.

Initially, we acknowledge the State emphasizes in its appellate brief that Kocsis failed to provide a justification on the record for why she wanted the specific jury charge for first-degree burglary.  *See generally Gilchrist v. State*, 364 S.C. 173, 178, 612 S.E.2d 702, 705 (2005) (finding "trial counsel's submission of the request to charge, without any further explanation of his point, was insufficient to preserve for review the trial court's failure to charge the specific language").  However, we are mindful that issue preservation is not meant to be a "gotcha game" and recognize Kocsis submitted a proposed jury charge to the trial court, the trial court held an off-the-record charge conference, and Kocsis renewed her objection on the record, which the trial court denied.  *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) (stating preservation is not a "'gotcha' game"); *cf. State v. Kromah*, 401 S.C. 340, 353, 737 S.E.2d 490, 497 (2013) ("Although the full grounds for the exception were not articulated on the record at the time of the objection, as would have been advisable to avoid a

question in this regard, it nevertheless appears from the transcript and the context of the proceedings that Kromah's reference to the parties' earlier discussion sufficiently apprised the trial court of the nature of the objection."). Thus, we reach the merits of Kocsis's issue.

The trial court did not err as to the jury charge. *See Marin*, 415 S.C. at 482, 783 S.E.2d at 812 ("[T]he trial court is required to charge only the current and correct law of South Carolina." (quoting *Brandt*, 393 S.C. at 549, 713 S.E.2d at 603 (alteration in original))); *id.* ("The law to be charged must be determined from the evidence presented at trial." (quoting *Brandt*, 393 S.C. at 549, 713 S.E.2d at 603)). Here, the trial court charged the definition of a dwelling and stated it was "any building or portion of a building which a person ordinarily sleeps"; it also stated that the defendant had to enter without consent. *See* § 16-11-310(2) ("'Dwelling' means its definition found in [s]ection 16-11-10 and also means the living quarters of a building which is used or normally used for sleeping, living, or lodging by a person."). Although Kocsis's proposed jury charge raises an issue about lawful possession and consent, there was no evidence of a legal ownership dispute as existed in *Singley*. *See* 392 S.C. at 273, 709 S.E.2d at 604-05 (discussing whether a defendant who owned a legal interest in a home was precluded from being convicted of burglary of that home as a matter of law). There was no contention that Kocsis had an interest in the home. Rather, the witnesses consistently identified the home as belonging to Ms. Rose or Ms. Rose Hoffberg and that Ms. Rose lived in the home. Moreover, Kocsis and her coconspirators broke a window and kicked the door to gain access to Ms. Rose's home to find Victim. Kocsis even testified Ms. "Rose Hoffberg . . . was standing behind the door" when the door was kicked and Ms. Rose was "the owner of the house."

Further, we acknowledge witnesses testified Ms. Rose's home was a drug or "trap house," and thus, Kocsis contends Ms. Rose's overall home could not be burglarized. However, Kocsis has not cited to any authority, nor have we found any, that supports this specific contention. During oral arguments, Kocsis argued this court should limit Ms. Rose's dwelling to her bedroom and urged the court to consider the other rooms in Ms. Rose's home—the kitchen, living room, guest bedrooms, and hall bathroom—not to be part of Ms. Rose's dwelling. We view this limitation to be illogical when considering Ms. Rose's dwelling was a residential home that Ms. Rose lived in, including on the night of the incident. Ms. Rose and her "castle," deserve the same protections under the law of first-degree burglary as any other home that meets the statutory requirements. *See* 4 William Blackstone, *Commentaries* \*223 ("Burglary, or nocturnal housebreaking, *burgi latrocinium* [robbery of the castle], which by our antient law was called

*hamesecken*, as it is in Scotland to this day, has always been looked upon as a very heinous offense: not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation . . . ." (first alteration in original)).  Thus, we hold the trial court did not err in issuing its jury charge.  Accordingly, we affirm on this issue.

## II.    Directed Verdict

Kocsis argues the trial court erred in not granting directed verdicts on her burglary and kidnapping charges.  We disagree.

"When ruling on a motion for a directed verdict, the trial [court] is concerned with the existence of evidence, not its weight."  *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014) (quoting *State v. Wiggins*, 330 S.C. 538, 544-45, 500 S.E.2d 489, 492-93 (1998)).  "On appeal from the denial of a directed verdict, [the appellate court] views the evidence and all reasonable inferences in the light most favorable to the State."  *Id.*  "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury."  *State v. Weston*, 367 S.C. 279, 292-93, 625 S.E.2d 641, 648 (2006).

### A.    Burglary

Kocsis argues the trial court erred in failing to direct a verdict on the burglary charge because (1) the State did not establish "the entry was without the consent of the person in lawful possession" and (2) the home "was not a structure that could be burglarized."  We disagree.

Section 16-11-311(A) provides the statutory crime of first-degree burglary.  In pertinent part, the statute states: "A person is guilty of burglary in the first degree if the person enters a dwelling without consent and with intent to commit a crime in the dwelling . . . ."  "'Dwelling' means its definition found in [s]ection 16-11-10 and also means the living quarters of a building which is used or normally used for sleeping, living, or lodging by a person."  § 16-11-310(2); *see also* § 16-11-10 (defining "dwelling" as "any house, outhouse, apartment, building, erection, shed or box in which there sleeps a proprietor, tenant, watchman, clerk, laborer or person who lodges there with a view to the protection of property shall be deemed a dwelling house").  "'Enters a building without consent' means: (a) To enter a building without the consent of the person in lawful possession; or (b) To enter a

building by using deception, artifice, trick, or misrepresentation to gain consent to enter from the person in lawful possession."  § 16-11-310(3).

We disagree with Kocsis's arguments that the trial court erred in denying her directed verdict motion on the burglary charge because (1) the State did not establish "the entry was without the consent of the person in lawful possession" and (2) the home "was not a structure that could be burglarized." *See Butler*, 407 S.C. at 381, 755 S.E.2d at 460 ("When ruling on a motion for a directed verdict, the trial [court] is concerned with the existence of evidence, not its weight." (quoting *Wiggins*, 330 S.C. at 544-45, 500 S.E.2d at 492-93)); *Weston*, 367 S.C. at 292-93, 625 S.E.2d at 648 ("If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury.").  As discussed above, there was not a dispute like *Singley* in this case.  Rather, Kocsis's argument is focused on the fact that the witnesses did not specifically identify Rosemary Hoffberg as Ms. Rose.  This argument is meritless because Kocsis specifically testified Ms. "Rose Hoffberg" was behind the door when she and the others broke into the home and Ms. Rose was "the owner of the house." Additionally, Varner instructed Chance to call 911 and to identify the home as Ms. Rose's, and Deputy Vandiver testified she spoke to the homeowner upon arriving at the scene.  Accordingly, this evidence supports that Ms. Rose was in possession of the home and did not consent to Kocsis and the others breaking into her home.

Moreover, as discussed above, we disagree with Kocsis's argument that Ms. Rose's home was not one that could be burglarized.  Two witnesses specifically testified that Ms. Rose slept in the home, including on the night of the incident. Additionally, the trial court admitted photographs of the home that depicted a home that someone was living in—there was a beer can, cleaning supplies, furniture, and a calendar flipped to the correct month.  We disagree that because Ms. Rose's house may have been a "trap house," Ms. Rose did not deserve the protections of the law.  Accordingly, we affirm on this issue.

## B.    Kidnapping

Kocsis argues the trial court erred in failing to direct a verdict on the kidnapping charges because the State did not establish the necessary mens rea.  We disagree.

"Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except

when a minor is seized or taken by his parent, is guilty of a felony . . . ."  S.C. Code Ann. § 16-3-910 (2015).

"Under the 'hand of one is the hand of all' theory [of accomplice liability], one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose."  *State v. Condrey*, 349 S.C. 184, 194, 562 S.E.2d 320, 324 (Ct. App. 2002); *see also Butler v. State*, 435 S.C. 96, 97-98, 866 S.E.2d 347, 348 (2021).  Under accomplice liability, it does not matter if the defendant knows whether his codefendant is going to undertake a particular criminal act.  *See State v. Longworth*, 313 S.C. 360, 372, 438 S.E.2d 219, 225 (1993) ("Under a theory of accomplice liability, it is immaterial whether appellant knew beforehand that [a codefendant] was going to shoot [a victim].").  In *State v. Crowe*, our supreme court held a murder was the natural and probable consequence of a mutual plan to commit a robbery.  258 S.C. 258, 265, 188 S.E.2d 379, 382 (1972); *see also State v. Cannon*, 49 S.C. 550, 555, 27 S.E. 526, 530 (1897) ("The common purpose may not have been to kill and murder, but if it was unlawful, as, for instance, to break in, and steal, and in the execution of this common purpose a homicide is committed by one, as a probable or natural consequence of the acts done in pursuance of the common design, then all present participating in the unlawful common design are as guilty as the slayer.").

The trial court did not err in denying Kocsis's directed verdict motion as to the kidnapping charges.  *See Butler*, 407 S.C. at 381, 755 S.E.2d at 460 ("When ruling on a motion for a directed verdict, the trial [court] is concerned with the existence of evidence, not its weight." (quoting *Wiggins*, 330 S.C. at 544-45, 500 S.E.2d at 492-93)); *Weston*, 367 S.C. at 292-93, 625 S.E.2d at 648 ("If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury.").  Here, the State presented direct evidence that Kocsis participated in a plan with others to break into Ms. Rose's home to retrieve her money.  Although Kocsis claims she did not know Chance and Murray were in the home, we find this argument unavailing under the theory of accomplice liability.  *See Condrey*, 349 S.C. at 194, 562 S.E.2d at 324 ("Under the 'hand of one is the hand of all' theory [of accomplice liability], one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose.").  Both Murray and Chance testified they felt they were not free to leave during the incident, and the kidnappings were a natural and probable consequence of breaking into Ms. Rose's home.  *Cf. Crowe*, 258 S.C. at 265, 188 S.E.2d at 381-82 (stating

murder was a natural and probable consequence of a mutual plan to commit a robbery). Moreover, Kocsis's argument is inconsistent about not knowing there could be people in Ms. Rose's home when compared to her burglary arguments—that Ms. Rose could not have an expectation to be safe and secure because there were so many other people in the home. Additionally, Murray testified she saw Kocsis at Ms. Rose's home "over a period of three years," and even Kocsis testified she "heard" about Ms. Rose's house before. Accordingly, we affirm on this issue.

## III. Kidnapping Sentences

Kocsis argues the trial court erred in sentencing her for her kidnapping convictions in light of her murder sentence. Citing *East*, Kocsis additionally contends the trial court erred in not sufficiently charging the jury about the requisite mens rea that was required to convict her of the separate offenses. We disagree.

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). Section 16-3-910 provides:

> Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by his parent, is guilty of a felony and, upon conviction, must be imprisoned for a period not to exceed thirty years unless sentenced for murder as provided in [s]ection 16-3-20.

"Our courts have long held, where an appellant has been sentenced for murder of a victim, this code section precludes a sentence for kidnapping of that victim, and any such sentence should be vacated." *State v. Vick*, 384 S.C. 189, 201, 682 S.E.2d 275, 281 (Ct. App. 2009). In *Vick*, this court noted the defendant failed to object to his sentences for murdering and kidnapping the same victim, but it vacated the kidnapping sentence for judicial economy. *Id.* at 201-03, 682 S.E.2d at 281-82.

In *State v. Vazsquez*, 364 S.C. 293, 302, 613 S.E.2d 359, 363 (2005), the criminal defendant was sentenced on four counts of kidnapping and two counts of murder for two of the kidnapping victims. Our supreme court vacated the kidnapping sentences as to the two murder victims but stated the sentences for the other two kidnapping convictions were proper. *Id.*

In *East*, the defendant argued the trial court erred in denying his directed verdict motion because "the brief confinement of the employees during the course of the armed robbery was not sufficient to constitute the separate crime of kidnapping." 353 S.C. at 636, 578 S.E.2d at 750. Our court noted South Carolina may be in the minority of jurisdictions in which "confinement can constitute the separate offense of kidnapping when it is incidental to the commission of another crime." *Id.* at 637-38, 578 S.E.2d at 750. Our court further stated the trial court emphasized to the jury it had to find the defendant possessed the requisite intent to commit both crimes—armed robbery and kidnapping; thus, our court affirmed. *See id.* at 638, 578 S.E.2d at 751.

Initially, we note Kocsis never specifically raised to the trial court that she could not be *sentenced* for the kidnappings of Murray and Chance in light of her murder sentence for Victim, and thus, this argument would traditionally be unpreserved. *See generally State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) ("Issues not raised and ruled upon in the trial court will not be considered on appeal."). However, in light of *Vick*, we reach the merits. *See Vick*, 384 S.C. at 201-03, 682 S.E.2d at 281-82 (vacating a kidnapping sentence when the defendant was also sentenced for murdering the same victim but failed to object).

Based on *Vazsquez*, we find the trial court properly sentenced Kocsis for the kidnappings of Murray and Chance because Kocsis was only sentenced for murdering Victim—not Murray and Chance—and thus, the prohibition found in section 16-3-910 does not apply. *See Vazquez*, 364 S.C. at 302, 613 S.E.2d at 363 (stating kidnapping sentences related to victims who were not murdered were proper); *see also Vick*, 384 S.C. at 201, 682 S.E.2d at 281 ("Our courts have long held, where an appellant has been sentenced for murder of a victim, this code section precludes a sentence *for kidnapping of that victim*, and any such sentence should be vacated." (emphasis added)). We acknowledge Kocsis cites two opinions from our supreme court from 1984 to support her position. *See State v. Livingston*, 282 S.C. 1, 8, 317 S.E.2d 129, 133 (1984); *State v. Stroman*, 281 S.C. 508, 514, 316 S.E.2d 395, 400 (1984). However, we are bound by *Vazquez* because it is the more recent opinion on this issue. *See State v. Phillips*, 416 S.C. 184, 194, 785 S.E.2d 448, 453 (2016) ("[I]t is incumbent upon the court of appeals to apply [the South Carolina Supreme Court's] precedent."); *id.* (emphasizing the court of appeals should generally consider recent case law from our supreme court when ruling on petitions for rehearing).

Moreover, as to Kocsis's argument that there was an issue with these jury instructions and the necessary mens rea for the separate offenses, this issue is

unpreserved because Kocsis did not timely state a specific objection on the record until her new trial motion. *See generally State v. Avery*, 333 S.C. 284, 296, 509 S.E.2d 476, 483 (1998) (finding an objection to a jury instruction was unpreserved when the defendant "did not object to the trial [court's] initial or supplemental instructions"). We note Kocsis's argument about the separate offenses did not appear in her jury charge memorandum to the trial court, and the trial court expressly stated in its denial of Kocsis's new trial motion that it issued all of Kocsis's requested charges except for the burglary language. Thus, based on our review of the record, Kocsis did not make an objection on this ground during the off-the-record charge conference.

Nevertheless, even if this issue were preserved, we find this case is similar to *East* because the trial court instructed the jury: "Each indictment charges separate and distinct offenses. You must decide each indictment separately on the evidence and law applicable, uninfluenced by your decision as to any other indictment. The defendant may be convicted or acquitted on any or all of the offenses charged." *See East*, 353 S.C. at 636-38, 578 S.E.2d at 750-51 (emphasizing the trial court instructed the jury to find whether the defendant possessed the requisite intent to commit both crimes—armed robbery and kidnapping). Accordingly, we affirm on this issue.

## IV.    State's Exhibit 1: 911 Call

Kocsis argues the trial court erred in admitting State's Exhibit 1 in violation of Rule 403, SCRE, because the call was "raw and emotional." She contends the admission of the call was cumulative because the individuals speaking on the call testified at trial. We disagree.

"The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847-48 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* at 429-30, 632 S.E.2d at 848. "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *State v. Green*, 412 S.C. 65, 79, 770 S.E.2d 424, 432 (Ct. App. 2015) (quoting *State v. Lyles*, 379 S.C. 328, 339, 665 S.E.2d 201, 207 (Ct. App. 2008)).

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina." Rule 402, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Rule 403, SCRE. "[E]ven where the evidence is shown to be relevant, if its probative value is substantially outweighed by the danger of unfair prejudice, the evidence must be excluded." *State v. Wiles*, 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009). "Unfair prejudice means an undue tendency to suggest decision on an improper basis." *Id.* "[T]he determination of prejudice must be based on the entire record, and the result will generally turn on the facts of each case." *State v. Stokes*, 381 S.C. 390, 404, 673 S.E.2d 434, 441 (2009).

In *State v. Stephens*, 398 S.C. 314, 319-22, 728 S.E.2d 68, 71-73 (Ct. App. 2012), our court held the trial court did not abuse its discretion in admitting a second photographic line up pursuant to Rule 403 because "[t]he central theme of [the] defense was discrediting [a witness's] identification of him in the second photographic line up."

The trial court did not abuse its discretion in admitting State's Exhibit 1 for "corroborative purposes and establishing the elements of the offense[s]." *See Douglas*, 369 S.C. at 429, 632 S.E.2d at 847-48 ("The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice."); *Green*, 412 S.C. at 79, 770 S.E.2d at 432 ("If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." (quoting *Lyles*, 379 S.C. at 338, 665 S.E.2d at 207)). Here, State's Exhibit 1 was the first piece of evidence that was admitted at trial, and Kocsis already raised in her opening statements that the witnesses were drug addicts and emphasized the jury needed to consider their credibility. State's Exhibit 1 supported the State's version of events by providing an account of what happened in "real time," and the recording identified Kocsis as being part of the group that broke into Ms. Rose's home and killed Victim. Additionally, during cross-examination of many of the State's witnesses, Kocsis questioned the witnesses about their credibility, their drug usage, criminal records, possible benefits from testifying, and the quality of their recollections of what occurred. In her closing argument, Kocsis emphasized the State's witnesses were drug addicts, asserted they were liars, attacked their credibility, and contended their memories were faulty. Kocsis's case is similar to *Stephens* because in light of the whole trial, Kocsis attempted to discredit the State's witnesses like the

defendant attempted to discredit the witness's identification in *Stephens*. *See* 398 S.C. at 319-22, 728 S.E.2d at 71-73 (holding the trial court did not abuse its discretion in admitting second photo line pursuant to Rule 403 because "[t]he central theme of [the defendant's] defense was discrediting [a witness's] identification of him in the second photographic line up). Thus, the trial court did not abuse its discretion in admitting State's Exhibit 1.

Finally, as to Kocsis's argument that State's Exhibit 1 was needlessly cumulative, this argument is unpreserved because Kocsis only argued at trial that State's Exhibit 1 would "stir up the passions and prejudices of the jury via using emotion rather than facts." *See Dunbar*, 356 S.C. at 142, 587 S.E.2d at 693-94 ("Issues not raised and ruled upon in the trial court will not be considered on appeal."); *id.* at 142, 587 S.E.2d at 694 ("A party may not argue one ground at trial and an alternate ground on appeal."). Accordingly, we affirm on this issue.

**CONCLUSION**

Based on the foregoing, Kocsis's convictions and sentences are

**AFFIRMED.**

**GEATHERS and HILL, JJ., concur.**